**Application of Thomas KAPATOS, Petitioner-Relator,**

**For a Writ of Habeas Corpus directed to the Warden of the City Prison, County of New York and Southern District of the United States, and/or Warden of Clinton Prison, Dannemora, New York.**

United States District Court
S. D. New York.
July 5, 1962.

———◆———

Joseph Aronstein, New York, N. Y., for petitioner and relator.

Louis J. Lefkowitz, Albany, New York, Atty. Gen. of the State of New York, for respondent, Ronald J. Offenkrantz, Deputy Asst. Atty. Gen., of counsel.

PALMIERI, District Judge.

This is a petition for a writ of habeas corpus by a state prisoner who was convicted of Murder in the Second Degree in the death of Albert DiLlulio and sentenced on November 29, 1938 to a prison term of twenty years to life.[1] He was subsequently released on parole and is presently imprisoned for breach of parole. A writ of error *coram nobis* was denied after hearing by the state court.[2]

The petition for a writ of habeas corpus alleges two grounds for relief: (1) Petitioner alleges that the prosecutor's failure to produce a statement given to an assistant district attorney by Vincent DiLlulio [2a] which was contrary to his testimony at the trial constituted knowing use of perjured testimony; (2) Petitioner alleges that the prosecutor's failure to call or disclose the existence of Michael Danise, who had observed two persons, neither of whom was the petitioner, escaping from the scene of the crime immediately after he had heard shots, constituted suppression of excul-

1. The conviction was affirmed by the Appellate Division, 257 App.Div. 938, 13 N.Y.S.2d 100 (1st Dep't 1939) and by the Court of Appeals, 282 N.Y. 655, 26 N.E.2d 802 (1940).

2. The writ was initially denied without a hearing. The Appellate Division, First Department, reversed for a hearing, 5 A.D.2d 855, 170 N.Y.S.2d 940 (1958). The denial after the hearing was affirmed by the Appellate Division, 8 A.D. 2d 600, 185 N.Y.S.2d 221 (1st Dep't 1959), Judge Burke denied leave to appeal to the Court of Appeals and the Supreme Court denied certiorari, 361 U.S. 852, 80 S.Ct. 113, 4 L.Ed.2d 91 (1959). Judge Noonan of this District denied a writ of habeas corpus without prejudice on October 4, 1961.

2a. The name "DiLlulio" was not spelled uniformly throughout the papers. We have adopted this spelling for the sake of consistency.

patory evidence. Both of these acts are alleged to have denied petitioner due process.

Albert DiLlulio died from multiple bullet wounds inflicted shortly after midnight on October 6, 1937.[3] His body was found in the doorway of a barbershop on 48th Street between 10th and 11th Avenues. A police officer testified that while on 47th Street and 10th Avenue, he heard four reports. Proceeding towards 48th Street, he saw a man run out of 48th Street onto 10th Avenue, proceed north for fifty or sixty feet, and hail a southbound taxicab. The man entered the taxicab, which continued south, until stopped by the police officer. A search of the occupant, who was Thomas Kapatos, the present petitioner, disclosed that he had two guns in his possession, a .38 calibre Smith & Wessen police revolver and a .32 calibre revolver. The .38 calibre revolver was warm and contained four discharged cartridges. Two boxes, one containing .38 calibre cartridges and one containing .32 calibre cartridges, were found in a closet in petitioner's home in which petitioner as well as other members of his family kept clothing, tools, and household articles. No cartridges had been removed from either of the boxes.

A ballistics expert testified that the bullet removed from the body of the deceased was fired from the same kind of gun as the .38 calibre gun taken from the petitioner, that the unexploded cartridges found in the cylinder of the gun taken from the petitioner were of the same manufacture and type as those contained in the box taken from the closet in petitioner's home, but that due to deformation of the bullet which obliterated its characteristics, he could not determine whether the bullet taken from the body of the deceased had been fired from the revolver taken from the petitioner.[4]

3. The police officer who apprehended petitioner testified that he heard the four shots at approximately 12:15 A.M. Another police officer testified that he heard the shots between 13 and 15 minutes after twelve. Lawrence Sexton, who owned a bar located on 48th Street between 10th and 11th Avenues, testified that petitioner entered his bar before midnight, stayed about 12 to 15 minutes, and left about twelve o'clock. He also testified, however, that when the petitioner returned with the police officer, it was about 12:05 and he had "just left." The police officers fixed the time by estimating the number of minutes the checking-out procedure at the station house consumed and the number of minutes it took them to walk from the station house to where they were when they heard the shots. Lawrence Sexton estimated the hour on the basis of his usual closing time. He also testified that he had heard no shots between the time the petitioner left and the time he returned with the police officer.

4. Adverse inferences could also be drawn from certain statements that petitioner was alleged to have made, and from inconsistencies in his testimony. The arresting officer testified that petitioner said to him, "Can't we fix this? It's worth a grand to you." (Trial transcript at p. 154). Another officer testified that he said to petitioner, "You done a very good job," and petitioner replied, "I always do." (Id. at p. 299). Petitioner denied both these statements. The credibility of the arresting officer was vehemently attacked by defense counsel. The officer had struck petitioner while he was in his custody but avoided disclosing it on cross-examination despite questions that were obviously directed at eliciting such information. He admitted it on rebuttal but only after defense counsel had established it through other testimony.

The taxicab driver testified that petitioner told him to go to "Penn. Station in a hurry." Petitioner denied that he said "in a hurry" and testified that his home was on 29th Street near Penn. Station and that he hoped he would meet someone in the vicinity who would advise him what to do.

During questioning by the assistant district attorney investigating the case, petitioner had at first denied ownership of the cartridges and later stated that he had found the boxes. At the trial he denied ownership and stated that he admitted ownership to the district attorney only after the district attorney told a police officer to bring in the whole family, including petitioner's mother who was ill, in order to establish ownership.

During the questioning by the assistant district attorney immediately after arrest, the petitioner stated that he left

The police officer who had apprehended petitioner inquired as to where he was coming from and when told by petitioner that he had been in a bar on 48th Street between 10th and 11th Avenues, he returned with petitioner to that bar. The owner of the bar stated that petitioner had been in the bar approximately 12 to 15 minutes, that petitioner had just left, and that he had not heard any noise between the time petitioner had left and the time he had returned with the police officer.

In response to questions put to him after his apprehension and when he testified at the trial, petitioner stated that he had been at the pier on 48th Street seeking work as a longshoreman on a French ship which was due to arrive that evening, that thereafter he remained to help passengers obtain taxis in return for tips, and that he was heading for the elevated train on 9th Avenue when he saw the guns on a stoop on 48th Street between 10th and 11th Avenues. After he took the guns and walked a few feet further, he saw the body of a man. He became frightened because he realized that the guns he had, might have been used to kill the deceased but was also afraid to put the guns back because he had a previous conviction and his fingerprints were already on the guns. He entered the bar, hoping to meet someone whom he knew and who could advise him. Petitioner denied ownership of the two boxes of cartridges.[5]

The only evidence of any relationship between petitioner and the deceased was the testimony of Vincent DiLlulio, brother of the deceased. At the trial Vincent DiLlulio testified that he knew the petitioner and that he saw petitioner and his brother talking on five or six occasions.[6] In response to questions by defense counsel, he testified that the only two questions asked him by the assistant district attorney on October 6, 1937 were whether he knew the petitioner and whether he knew "what it was all about," that he answered the first question in the affirmative and the second question in the negative, and that the answers were taken down by a stenographer. A motion by defense counsel for the stenographic transcript was denied by the Court. However, the prosecutor stated that he had no such transcript but would search for it. No stenographic transcript of that conversation was ever produced.

At the hearing on the petition for a writ of error *coram nobis*, Sylvester Cosentino, the assistant district attorney who handled the Kapatos investigation from October 6, 1937 to December 31, 1937, testified that he asked Vincent DiLlulio whether he knew the petitioner and whether he knew why petitioner would want to shoot his brother, that Vincent DiLlulio answered each question in the negative and that these statements were made in the presence of the petitioner and were taken down by the same stenographer who took down the interrogation of the petitioner, which had been transcribed. Mr. Cosentino had resigned from the district attorney's office before petitioner was brought to trial and Herman McCarthy, the assistant district attorney who prosecuted the case, testified

---

the bar as soon as he saw that no one whom he knew was present. At the trial he testified that he had two beers, thereby making his testimony correspond with that given by the owner of the bar.

Petitioner also gave a false name and refused to give an address when first brought to the station house.

On the other hand, the state made no effort to explain the presence of a pool of blood a few feet distant from where the body was found. In his summation, defense counsel emphasized that petitioner could not have moved the body and run from where the body was found to

where he hailed the taxicab, a substantial part of an avenue block, in the time it took the police officer to run from 47th Street to 48th Street.

5. See note 4, supra.

6. He also testified that relations between his brother and petitioner appeared to be friendly, but that for about a week preceding his death, his brother and petitioner had an argument over a collection and that on the evening of his death, his brother and petitioner had a fist fight. This testimony was later stricken on the ground that it was hearsay.

that he knew that Vincent DiLlulio had been interrogated, that he searched his files and could not find the statement, but that he did not ask the stenographer for it.

Petitioner did not establish that the testimony given by Vincent DiLlulio at the trial respecting the relationship between the deceased and the petitioner was false. He did establish, however, that Vincent DiLlulio's testimony that he had told the district attorney on the morning of October 6, 1937 that he knew petitioner, was false, and that the state had a record of the previous testimony which indicated that it was false.

Michael Danise lived in an apartment on 48th Street between 10th and 11th Avenues, with windows facing onto 48th Street. In his statement to Mr. Cosentino and in his testimony before the Grand Jury, he stated that on midnight of October 6, 1937, he heard noises that sounded like the backfiring of a car. He opened the window, looked out and saw a car without lights traveling westward on 48th Street, which was an eastbound street. The doors of the car were open on both sides and two men were running after it; one of these men jumped into and the other one was pulled into the car. He was asked a number of times whether he knew Thomas Kapatos, whether he knew who shot the deceased, and whether

Thomas Kapatos shot the deceased. He stated that he did not know who shot the deceased and that he did not know Thomas Kapatos.

Subsequently, Danise was taken by a police officer to the courtroom in which petitioner was being arraigned to see whether he could identify him and he stated that petitioner was not one of the two men whom he saw running to the automobile.

Michael Danise was not a witness at the trial.

Mr. McCarthy testified that he had the transcript of Danise's interrogation and of his testimony before the Grand Jury but did not call Danise as a witness or inform defense counsel of his existence because he did not consider his testimony probative and did not have confidence in his credibility. Danise's cross-examination did establish a prior criminal record, but his testimony that he did not know petitioner and had never spoken to him before 1953 [7] remained uncontradicted. Nor was it shown or even suggested that Danise had any motive for fabricating testimony favorable to petitioner.

At the hearing, Danise also testified that after the car had left he saw a man walking up 48th Street, from 11th to 10th Avenue, and that petitioner was the man whom he saw.[8]

7. Petitioner testified at the hearing that he learned of Michael Danise through a casual conversation with a police detective in the neighborhood shortly after he was released from prison in 1952. The detective did not, however, know Danise's name or address other than that he was called "Mike the Iceman" and that he lived near the scene of the crime. It was for this reason that petitioner did not meet Danise till 1953.

8. It is not clear whether this information was brought to the state's attention prior to the trial. Mr. Cosentino testified that he did not remember and did not think Michael Danise ever told him that he saw a man walking east on 48th Street after the car had left. The transcript of Danise's interrogation by Mr. Cosentino contains the following questions and answers:

Q. After you saw the man pulled in the car, you say it proceeded right to 11th Avenue.
A. Yes.
Q. You didn't see anybody come back from the car at all?
A. Nobody at all.
Q. You're sure the two men got in that car?
A. Positively.
Q. Did you see anybody else on the street at that time?
A. There wasn't a soul on the street at that time.
(People's Exhibit 1, pp. 2–3)
At the hearing Danise testified that at the time he saw the car he did not see anyone else on the street and that he did not tell Mr. Cosentino that he saw a man walking later because he did not ask him. He testified that he tried to tell the Grand Jury about it but was cut off in

It has been an established principle of our jurisprudence, at least since the Supreme Court decision in Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), that a state's conduct of a prosecution may be so contrary to fundamental concepts of justice as to constitute a denial of due process, correctible by a writ of habeas corpus. See generally Hart and Wechsler, The Federal Courts and the Federal System, 1232–1313 (1953); Reitz, Federal Habeas Corpus: Post-Conviction Remedy for State Prisoners, 108 U.Pa.L.Rev. 461 (1960). Knowing use of perjured testimony, White v. Ragen, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348 (1945); Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L. Ed. 214 (1942), failure to correct false testimony, Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957), and failure to disclose evidence that would have completely exonerated the accused, United States ex rel. Montgomery v. Ragen, 86 F.Supp. 382 (N.D.Ill.1949), are clear examples of conduct constituting a denial of due process.

While the criteria that render other conduct in this area a violation of due process have not yet been defined, clearly the guarantee of due process extends beyond the examples enumerated. See generally, The Duty of the Prosecutor to Disclose Exculpatory Evidence, 60 Colum.L.Rev. 858 (1960). In United States ex rel. Thompson v. Dye, 221 F.2d 763 (3rd Cir.1955), defendant testified that he was under the influence of liquor and drugs when he committed the homicide. The Court held that failure to disclose the statement of an arresting officer that the defendant was under the influence of liquor at the time of the arrest, approximately four hours after the shooting, constituted a denial of due process because such evidence might have led the jury to believe Thompson's testimony and to convict for Murder in the Second Degree rather than in the First Degree or to recommend life imprisonment rather than the death penalty. In United States ex rel. Almeida v. Baldi, 195 F.2d 815, 33 A.L.R.2d 1407 (3rd Cir.1952), cert. denied, 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341, a policeman was shot during an armed robbery and defendant was tried for Murder in the First Degree. The Court held that failure to disclose evidence which would have established that defendant had not fired the bullet that killed deceased constituted a denial of due process, even though the jury was instructed that defendant could be found guilty of Murder in the First Degree regardless of who had fired the fatal bullet, on the ground that the jury might have recommended life imprisonment rather than the death penalty if it had known that defendant was not the person who actually killed the deceased. While both of these cases are explicable as failure to correct false evidence and were so cited by the Supreme Court in Napue v. Illinois, supra, the emphasis, particularly in the opinions written in Thompson, was on the state's failure to disclose evidence that might have had substantial significance for the defense. See also Curran v. Delaware, 259 F.2d 707, 711 (3rd Cir.1958).

the middle. The following appears in the Grand Jury transcript:

Q. Is there anything else you can tell us about this case?

A. That's all, because the next morning my mother told me she heard from his people—

Q. All right * * *.

(Transcript of hearing, p. 77.)

When asked whether he told the police officer who had taken him to identify Thomas Kapatos, he replied that he did not because he hadn't asked him anything about petitioner other than whether he was one of the two men whom he saw enter the car. He then testified that he started to tell the police officer but he would not listen. After he was shown an affidavit signed by him, he testified that he told the police officer that petitioner looked like the man he saw walking eastward on 48th Street. At the hearing he stated that he was positive petitioner was the man whom he had seen.

In Kyle v. United States, 297 F.2d 507 (2d Cir.1961), not directly applicable because the Court there was concerned with a federal prisoner, Judge Friendly quoted the view of the editors in the Columbia Note, supra, that the rule is that knowing use of perjured testimony requires reversal even though prejudice is not affirmatively shown, whereas prejudice is the central matter of inquiry in the area of passive non-disclosure. The Court concluded that the "required showing of prejudice, to vary inversely, with the degree to which the conduct of the trial has violated basic concepts of fair play." p. 514. While it is not clear whether the Court was formulating due process criteria in Kyle, it is evident that analogous criteria must apply in determining whether the state's failure to disclose evidence that would weaken its case constitutes a denial of due process.

Having carefully read the record of the trial in this case and considered the undisclosed testimony in light of that record, I am compelled to conclude that the prejudice to defendant resulting from the state's withholding of Danise's testimony from the jury without informing the defense of its existence constituted a denial of due process.

Essentially the evidence implicating petitioner consisted of two highly incriminating facts—his possession of the gun from which the fatal bullet or bullets were probably fired and the presence of cartridges in a closet used by him which were identical in type and manufacture with those found in the cylinder of the gun. The conclusion that petitioner committed the homicide was almost inevitable. First, petitioner's story was not very plausible. Second, there was not the slightest evidence of the existence of anyone else who might have committed the crime. Indeed, that possibility was excluded by the testimony of the police officers that they did not see anyone else in the vicinity immediately after they heard the shots. Testimony by an apparently disinterested witness who was probably the first to view the scene of the crime that he saw two other persons

escaping under extremely suspicious circumstances, might well have raised a reasonable doubt in the jury's mind as to defendant's guilt. It would have supported a conclusion that someone else had committed the crime. It would also tend to corroborate petitioner's story, particularly if defense counsel had succeeded in bringing out Danise's testimony that he saw the defendant walk up 48th Street after the shooting and after the car had disappeared from view.

■ The purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty one. The average accused usually does not have the manpower or resources available to the state in its investigation of the crime. Nor does he have access to all of the evidence, much of which has usually been removed or obliterated by the time he learns that he is to be tried for the crime. In view of this disparity between the investigating powers of the state and the defendant, I do not think it imposes too onerous a burden on the state to require it to disclose the existence of a witness of the significance of Danise in the instant case. At the very least, the trial judge should have been made aware of this evidence, and a ruling should have been requested by the prosecutor with respect to his duty in the premises. His unilateral decision to keep the evidence undisclosed invited the risk of error.

In view of what has already been said it need not be decided whether the prosecutor's failure to correct Vincent DiLlulio's testimony that he identified petitioner on the morning of the crime brings this case within the ambit of Napue v. Illinois. While I do not think that an accused's rights as defined by Napue should depend on the fortuitous circumstance that the district attorney who conducts the investigation also conducts the prosecution, Vincent DiLlulio was not as central a witness for the prosecution as was Harmon in the Napue case, nor was the matter with respect to which he lied as significant. It should be noted, however, that to the extent that exposing the falsehood would have cast doubt on the

credibility of the only witness establishing any relationship between the petitioner and the deceased, it would have seriously weakened the state's case against the petitioner.

The petition for a writ of habeas corpus is granted and petitioner is ordered discharged within thirty (30) days, unless the state has appealed this order prior thereto.

So ordered.