**Herman JACKSON, Jr., Appellant,**

v.

**L. L. WAINWRIGHT, Director, Division of Corrections, State of Florida, Appellee.**

**No. 24233.**

United States Court of Appeals Fifth Circuit.

Feb. 26, 1968.

---

6. H & B American Machine Co. v. United States, 11 F.Supp. 48, 52, 81 Ct.Cl. 584 (1935).

Walter G. Arnold, Jacksonville, Fla., for appellant.

Earl Faircloth, Atty. Gen., James G. Mahorner, David U. Tumin, Asst. Attys. Gen., Tallahassee, Fla., for appellee.

Before TUTTLE and WISDOM, Circuit Judges, and HEEBE, District Judge.

WISDOM, Circuit Judge:

In this habeas proceeding we hold that the prosecutor's failure to disclose exculpatory evidence violated the duty of candor imposed on a prosecutor in dealing with a criminal accused. The undisclosed evidence related to the critical issue of the identification of the accused as the guilty party, and the exculpatory evidence came from the only eyewitness to the alleged criminal act. In these circumstances, the effect of the nondisclosure was to deprive the defendant of a fair trial.

\* \* \*

In the early evening of February 26, 1960, in the Lake Worth Section of West Palm Beach, Florida, near Dixie Highway, Herman Jackson, the petitioner— so the State of Florida charged—pulled a thirteen year old girl from a telephone booth, dragged her across the road into some bushes, and at the point of a knife raped her.

In investigating the crime, local officers learned that Jackson's father had a home in the neighborhood near where the act had occurred; that Jackson visited his father's home on the day in question and he had been seen at a saloon in the area playing cards and drinking beer. Jackson was arrested March 3, 1960. He was exhibited to the victim, through a one-way mirror, with one other man, a Puerto Rican. She identified Jackson as her attacker.

The officers who interrogated Jackson testified that he denied his guilt and permitted them to search his house.[1] He

1. Defense counsel contended that the trial court erred in denying the defendant's motion to suppress the evidence police seized during a search of Jackson's room in the house of his parents-in-law. On appeal the Florida Supreme Court held that the evidence was admissible, because the defendant had "freely and voluntarily

told them, "I ain't got nothing to hide". As a result of the search, the officers seized certain clothing, including a pair of trousers, later introduced at the trial, which allegedly contained traces of semen and blood. At the trial, Jackson acknowledged that on February 26 he had been in the general area where the rape occurred, but asserted that he had been there to visit his father and to play cards and have some drinks with friends. In addition to the spots on Jackson's trousers, there was other circumstantial evidence. The State contended that molds of shoe tracks taken from the ground near the telephone booth and where the crime occurred matched tracks of the shoes Jackson wore February 26, 1960. The State introduced in evidence fibers of cloth, taken from the bushes in the area, allegedly similar to the fibers in the clothes Jackson was wearing February 26. The identification of the shoe tracks and the fibers was not positive. The defense sought to explain the spots on his trousers by Mrs. Jackson's testimony that she and her husband had intercourse that evening when he returned home; that since the birth of her child five months before, she had been subject to vaginal bleeding. The blood samples were not positively identified as to type.

There was one eyewitness. This witness, Mrs. Alta Elberty, saw the preliminary struggle as she was driving by on the highway at about eight o'clock at night. At a hearing on a motion for a new trial she testified that "it seemed as though it was quite lit up for that time of the evening, I noticed that it was quite light compared to what it usually is". She saw what appeared to her to be a young blond girl about three feet from the curb struggling with an "older brother or an older member of the family twisting her arm" or "some teenagers horsing around." [2] Mrs. Elberty, feeling that there was nothing amiss, did not stop her car or then report the incident. The next day, however, on reading the newspapers she concluded that she had witnessed part of the crime. As she testified later, "it didn't dawn on me until the papers came out, and in the papers it said a Negro boy assaulted a white girl, and I said, well I said that isn't the thing I saw, because he wasn't a Negro, and I said this to different people. * * *" Mrs. Elberty, a beautician, stated that she was especially conscious of complexions and hair coloring.

March 9 Mrs. Elberty went to the Lake Worth Police Station, where she was shown photographs of five young girls. She immediately picked out the girl that she had seen the previous Friday night, the victim, and described her as having "light blonde short hair".

In a signed statement to the Lake Worth Police Department dated March 28, 1960, Mrs. Elberty stated: "I did not get a good look at the boy who was with her [the victim]. I could not identify him." But she had no doubts that his skin was light. Testifying at the first hearing on the motion for a new trial, Mrs. Elberty said that she had told the police:

"I didn't think it was the same thing because it wasn't a Negro, in my mind, it wasn't a Negro that I had seen the night before."

consent[ed]" to the search. Jackson v. State, 132 So.2d 596, 597. In the hearing before the district court the defendant denied that he had consented to the search. On appeal, defense counsel argued strongly that Jackson had never consented to a search; that even if the testimony of the State's witnesses were accepted as true, there was no waiver by Jackson. The Court has concluded that it is unnecessary to decide this question.

2. This and other quoted statements of Mrs. Elberty are taken from her testimony in the hearings on the motion for a new trial.

Jackson is a dark-skinned, full-blooded or nearly full-blooded Negro.[3] Mrs. Elberty testified that the man she saw

"wasn't the defendant because he wasn't as dark as this boy."

Under vigorous cross-examination, Mrs. Elberty was uncertain just how to characterize the man, but she never wavered in her conclusion that he was too light-skinned to be Jackson. She stated that "from the front he looked white and from the back he looked colored". And she admitted that the man she saw might have been a white man with a sun tan, a Puerto Rican, or a light-skinned Negro—but she invariably described him in terms that could not have fitted Jackson.

Before the trial Jackson's attorney, court-appointed, was put on notice only that Mrs. Elberty could not identify the attacker. The record contains the affidavit of George W. Greer who is not identified but appears to have been a deputy sheriff. The affidavit states that about one week before the trial defense counsel called at Greer's office to inspect the physical evidence against Jackson and to obtain a list of witnesses.[4] Greer gave him a list of witnesses that included Mrs. Elberty's name and address. But Greer informed the attorney that Mrs. Elberty saw the incident and could identify the girl but not the attacker. In his motion for a new trial, Smith alleged that on several occasions he had attempted to reach Mrs. Elberty by telephone, but had been unable to do so.[5]

The State subpoenaed Mrs. Elberty and she was present when the case was called. She was not put on the witness stand.[6] At about four o'clock in the af-

---

3. In the habeas hearing in the district court the following colloquy occurred between the trial judge and Jackson:

  THE COURT:
  All right. Now there is one other thing that I would like to ask you. My observation is that you are a dark brown color, that you appear to be full or nearly a full-blooded Negro?
  THE WITNESS:
  Yes sir.
  THE COURT:
  Your color is dark, is it?
  THE WITNESS:
  Yes sir.
  THE COURT:
  It's a dark brown, your color. Your hair is kinky and your eyes are dark. Would you say that's a fair description of your physical appearance?
  THE WITNESS:
  Yes sir, although I have got a little lighter since I've been—
  THE COURT:
  What?
  THE WITNESS:
  I say, yes sir, although I've got a little lighter.
  THE COURT:
  You are a little lighter now than you were three years ago?
  THE WITNESS:
  Yes sir.

4. The affidavit, in part, states: "[A]pproximately one week prior to July 13, 1960, [the] defense counsel for Herman Jackson, Jr., called at my office to in- spect the State's evidence in the case of the State of Florida vs Herman Jackson, Jr. Before showing Mr. Smith the physical evidence I got out the case file and went over the list of witnesses with him. I told Mr. Smith who already had a copy of the list of state's witnesses in his possession who each of the witnesses were and essentially what we expected to prove with each witness. Included in the list of witnesses was the name of Mrs. Alta Elberty, 1325 So. 'N' Street, Lake Worth. I told Mr. Smith that Mrs. Elberty had seen the incident but couldn't identify the attacker. Mr. Smith made notes of the various witnesses but made no particular comment on any one of them except to say he had talked to some of them and would probably see the others prior to the trial."

5. Both the State Attorney and the trial judge commended defense counsel for his "fine work" and the "very thorough job" he did. "He did every conceivable thing that could have been done to bring everything before the Court."

6. She would have been of no help to the State. The prosecutor, in his argument on the motion for a new trial, explained: "[S]he would have been used if there had been any questions about whether or not there had been a struggle there, but she saw only the girl and could not describe the person, she made a statement to the police and cited it and said, I did not see, she picked out the girl and she could not see anything other than that. The

ternoon of the first day of the trial, Mrs. Elberty spoke with the prosecutor in the witness room. Apparently this was the first time he had seen her. She complained about losing time from her work, and sought to be excused. She later testified that she informed him, as she had informed the police, that the man she had seen—who could have been the brother of the blonde victim—was "lighter" than the defendant whom she had seen in the courtroom that morning. She specifically "brought to his [the prosecutor's] attention that his color, that the color of the man that I saw that night at that moment with the girl was not a dark person."

Jackson maintained his innocence throughout the trial and at his sentencing. His unsuccessful defense was an alibi. The trial judge, in his charge to the jury regarding the weight to be given to the testimony of the prosecutrix, instructed the jury that "no other person was an immediate witness to the alleged act."

Shortly after the trial, defense counsel moved for a new trial based on newly discovered evidence.[7] On direct examination at the hearing on this motion, July 28, 1960, Mrs. Elberty testified that she thought the man she saw was "an older brother or an elder member of the family" of the young light blonde girl; that "he wasn't a Negro"; that "his complexion [did not] in any way look like the complexion of the defendant" but "was light, no, it wasn't the defendant because he wasn't as dark as this boy * * * so, I dismissed it from my mind". On cross-examination Mrs. Elberty testified:

Q Did you say anything to the police about it?

A I didn't think it was the same, I didn't think it was the same thing because it wasn't a Negro, in my mind, it wasn't a Negro that I seen the night before.

Q You did say, when you went by and looked back that you thought it was a Negro then?

A Well, it couldn't have been.

Q You said when you looked at him from one way he looked like a white man and when you looked at him from the other direction he looked like a Negro?

A Well, when I went by, from the back—I mean from the front, from the front view, he looked like a tanned —or a Porto Rican, or a light skinned Negro or someone like that.

Q He looked like a light skinned Negro or Porto Rican?

A Yes.

Q Darker than a white person?

A Yes, because I compared the—

Q Did you tell the police when they finally did catch up with you on March 9th, did you say, I did not get a good look at the boy with her?

A Well, not enough to identify him, to say, now, this is one.

Q You now say he was a Porto Rican or a light skinned person from front view that you got of him, and when you looked back at him in your rear view mirror, you thought he was a Negro?

A Yes.

As the record indicates, local newspapers picked up the significance of Mrs. Elberty's testimony and published articles on the hearing. Thereupon the prosecutor initiated a second hearing August 2, 1960. At this hearing he presented the affidavit, previously referred to, of George Greer, then in military service. And he recalled Mrs. Elberty. Defense counsel objected to the hearing "to rebut any extra-judicial statements that have been made by the papers about * * * what went into the record here as of last Thursday". The prosecutor stated that he was not

only thing that she was a help to the State was that she could have proven that the girl she saw was running the [sic] trying to get away from somebody."

7. And based on the trial judge's denial of the plaintiff's motion to suppress the evidence seized during the search of the Jackson's home.

concerned with the newspapers; he wished to rebut the rebuttal and he wanted the court to have the full picture. Mrs. Elberty held her ground.[8] She testified:

"As I maintained all along, he was light skinned. * * * Well by rights and by all fairness to everything, I merely said that the man that I saw that night—skin was lighter than Jackson's."

The trial judge denied the motion for a new trial on the grounds that Mrs. Elberty's testimony, under the law of

---

8. On cross-examination, Mrs. Elberty testified, in part, as follows: "Q Did you at any time tell me that Herman Jackson was not the man that you saw? A Your Honor, may I— Q Yes, explain it. A —explain what I said in the witness room? Q Yes, explain it, explain it fully. THE COURT: Explain it completely. * * * THE WITNESS: "[H]e said, do you recognize this young lady sitting here, and I said, yes, she is the young lady in question or words to that effect, she is the young lady—and he said—how did it. go, let me see now—did you see her being dragged across the road, and I said, no, sir, I did not see her being dragged across the road, I saw a young man standing with her arm, her left arm. twisted behind her back and they were standing at the edge of the road on the night in question as I was passing in an automobile, and he said, why didn't you stop, and I said, I didn't think that it was anything unusual, and he said, well, the defense witness will ask you this, and he said, something, why didn't you stop, and I said, well, I didn't think it was occasion to stop or words to that effect, and you [the prosecutor] said, why not, and I said, well, the man seemed, was lighter than the man and I saw, that the man by the side of the road was lighter than the— Q Did you ever make the statement at that time that he was white, have you ever made that statement? A No, I did not, I merely said that in passing, when I was passing I found no occasion to stop the car there. Q Did you ever tell anybody that you pointed that man out and told me that this was not the man, did you ever make that statement? A In my testimony in the Courtroom I was asked if Jackson was the man that I saw that night. Q I mean at the time that I talked to you? A At the time, no; no, I merely brought your attention that his color, that the color of the man that I saw that night at that moment with that girl was not a dark person. Q Was not as dark? A Not as dark, no. Q Well, you remember testifying the other day, don't you? A Yes. Q At that time do you recall making this statement: "Yes, it seemed like it was —" Well, I asked you: "When you looked back through your rear view mirror you thought it was a Negro chasing the girl?" And you said: "Yes, it seemed like it was." A Yes, it could have been, there is an indefinite—I was looking through the back window mirror and the light at that time, as I passed, it seemed that they went into darkness, I saw her pink dress, I saw her break away and run. Q It is obvious then that you did think he was colored when you went by them, isn't that true? A That I did think he was colored? Q Let me read this to you: "When you looked back through the rear view mirror—" This is testimony taken in the other Courtroom on the 29th of July: "Q When you looked back through the rear mirror, you thought it was a Negro chasing the girl? "A Yes, it seemed like it was, the flashback at the moment, I think it is unusual now, from the front he looked white and from the back he looked colored." A That's right, yes, that's right, that's true. Q When you went by you thought he was colored when you looked back? A And when I—I mean I didn't recognize this until after it came out in the paper that it was— Q That you really, you mean that you couldn't make much identification at all? A I couldn't say that it made such an impression on me that I knew what was going on, I didn't know what was going on at the time. Q You don't now say that you— A No, I don't now say that I knew. Q You don't say now that it was or was not Jackson, do you? A No, I don't say that it wasn't or I don't say that it was, but at the time it just didn't impress me as being—his skin was not—the man that I saw, his skin was not as dark as Jackson's. Q It did not appear as dark? A No. Q In a beauty parlor you have the occasion to know the difference between light and colored skin, don't you? A Yes, I do. * * * Q You were not able to identify who it was or anything about him at that time? A That's right. Q You couldn't say who it might be? A No, sir, it would have been impossible. Q It was impossible to see his description as you rode by, of the fellow, the back of him? A As I maintained all along, he was light skinned. * * * Q So then if I asked you, did you ever tell anybody that he was not Jackson— A I never— Q Not the

Florida, was not newly discovered evidence, that it was contradictory, and would not produce a different verdict if a new trial were granted. On appeal the Supreme Court of Florida upheld the conviction and the denial of the motion for a new trial. Jackson v. State, Fla.Sup.Ct., 1961, 132 So.2d 596.

Jackson then sought relief by petition for a writ of habeas corpus in the federal district court,[9] stating, among other allegations, that he was denied a fair trial because of the exculpatory evidence supplied by Mrs. Elberty. The parties called no witnesses to testify on this issue; they agreed to rely on the transcript of the two post-trial hearings. The district court denied the writ. This Court granted a certificate of probable cause, leave to appeal in forma pauperis, the request for appointment of counsel on appeal, and a stay of execution.

We reverse the judgment of the district court, and order that the writ issue, subject to the right of the state to retry Jackson.

I.

█ A weakness in the adversary system of administering justice is the possibility of unfairness arising (sometimes) from the prosecution's superior resources and special access to information and witnesses. To protect the innocent who might suffer from this unequal contest, Canon 5 of the American Bar Association Canons of Professional Ethics commands: "The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible." So also com-

man you saw? A No. Q You did not say that? A Oh, pardon me, pardon me. May I have that question retracted? Q Did you ever tell anybody that it was or was not Jackson? A (No response.) Q That is, did you make a positive statement either way to anybody? A (No response.) Q Did you understand my question? It is just rephrasing a question that I previously asked you? A (No response.) Q Let me—I don't want to confuse you at all. I believe I asked you a few minutes ago, could you now say or have you ever said that it was Jackson or was not, and I believe you said that you had not said it wasn't him or it was him. Is that what your answer was a few minutes ago? A Well, by rights and by all fairness to everything, I merely said that the man that I saw that night—skin was lighter than Jackson's. Q That is all that you have ever said, isn't it? A Because that is what I was asked and that is what I said. Q Is that the only thing you have ever said? A And I contended that from the very beginning. Q And you now say it? A That's right. Q And my question was that you have never told anybody that it wasn't Jackson or that it was him, you could not identify him or you could not dis-identify him? A Oh, pardon me. Rephrase that,—I have never told anyone that the rapist was not Jackson? Q Yes? A I have not put it in those words. Q That's right. A I merely said that the

man at the scene that night when I passed— Q Did not appear to be— A Did not appear to be as— Q I think you corrected that this morning when you say —the witness said she didn't think it was the rapist,—you never said that? A Anything could have happened after I saw this because I was not at the—I was not at the scene of the crime. I saw no crime committed as far as a crime is committed. Q All you know is that when you went by one time you thought he might even be a Porto Rican? A That's right. Q Did he appear darker than a white person? A Yes, sir. Q There is no question about that, is there? A Yes, sir, that is right."

The redirect examination was as follows: "Q Mrs. Elberty, you are a beautician? A Yes, sir. Q You are familiar with complexions? A Yes, sir. Q You see the defendant, Jackson, sitting here? A Yes, sir. Q The person you saw on the night in question, did he have the same complexion that Jackson does, sitting here? A No, sir."

9. Jackson originally filed his petition in the United States District Court for the Southern District of Florida. The court denied it without a hearing. He then sought the writ in this Court. By order of April 12, 1963, we transferred the matter to the Middle District of Florida, the court within whose jurisdiction Jackson is incarcerated. This appeal comes from that court.

mands the due process clause of the Constitution.

The recent development of the prosecutor's constitutional duty to disclose evidence favorable to the defendant may be said to have begun in 1935 with Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed.2d 791.[10] Mooney sought a writ of habeas corpus in the Supreme Court on allegations that his conviction had been secured through the use of evidence known by the prosecution to be false. Although the Court denied the writ on procedural grounds, the Court stated that "a deliberate deception of court and jury by the [State's] presentation of testimony known to be perjured" was a denial of due process. The Court took pains to reject the assertion of the California Attorney General that it was a fallacy to suggest "that the acts or omissions of a prosecuting attorney can ever, *in and by themselves,* amount either to due process of law or to a denial of due process of law." 294 U.S. at 111–112, 55 S.Ct. at 341. The Court expanded this doctrine in a line of later cases in which

the prosecution did not solicit the false testimony but made no move to correct it.[11] In Brady v. State of Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 the Court made it clear that its primary interest was not to punish misconduct by the prosecutor, but to insure a fair trial to the defendant, and particularly to insure that the trial would bring out, not hide, the truth. Before *Brady* the Court seemed to have placed some weight on the willfullness of the prosecutor's action, but in *Brady* the Court said:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material [either] to guilt or to punishment, *irrespective of the good* [faith] *or bad faith of the prosecution."* 373 U.S. at 87, 83 S.Ct. at 1196 (emphasis added).

In accord with *Brady* lower federal courts have emphasized the harm to the defendant rather than the prosecutor's motive in failing to disclose exculpatory evidence.[12] In the important case of

---

10. See United States ex rel. Meers v. Wilkins, 2 Cir. 1964, 326 F.2d 135. The constitutional development is traced in an excellent note, The Duty of the Prosecutor to Disclose Exculpatory Evidence, 74 Yale L.J. 136 (1964). See also the discussions in 60 Col.L.Rev. 858 (1960), 39 N.Y.U.L.Rev. 564 (1964) and 77 Harv. L.Rev. 1528 (1964).

11. Earlier the Court had said: "Petitioner's papers * * * set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the *deliberate suppression by those same authorities of evidence favorable to him.* These allegations sufficiently charge a deprivation of rights guaranteed by the Federal Constitution * * *." Pyle v. State of Kansas, 1942, 317 U.S. 213, 214, 215, 63 S.Ct. 177, 87 L.Ed. 214. See also White v. Ragen, 1945, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348; Alcorta v. State of Texas, 1957, 355 U.S. 28, 78 S. Ct. 103, 2 L.Ed.2d 9; Napue v. People of State of Illinois, 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. See also, Miller v. Pate, 1967, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690.

12. One of the first federal decisions on mere negligent suppression of evidence was Griffin v. United States, 1950, 87 U.S.App.D.C. 172, 183 F.2d 990. Griffin was convicted of murder, over a plea of self-defense. After the trial it was learned that the prosecution had failed to disclose that the victim had an open knife in his pocket. The prosecution apparently believed, with good cause under the prior law, that this fact would not be admissible as an undisclosed threat. On Griffin's motion for post-conviction relief, and under some prodding from the Supreme Court, the court held that the evidence would have been admissible, and that the failure to disclose it required that a new trial be granted. "When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful." 183 F.2d at 993. The Supreme Court had stated in its opinion: "Were the Court of Appeals to declare that the [controverted] evidence was admissible according to the law prevailing in the District, it would have to consider further whether it would not be too dogmatic, on the basis of mere speculation, for any court to conclude that the jury would

United States ex rel. Almeida v. Baldi, 3 Cir. 1952, 195 F.2d 815, 33 A.L.R.2d 1407, cert. denied, 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341, Almeida was prosecuted on a felony-murder theory as a result of the death of an off-duty police officer who was shot during an attempted robbery committed by Almeida and others. At Almeida's trial the evidence presented suggested that the officer had been killed by a bullet from Almeida's gun. Later, it was discovered that the police knew that the single bullet fired by Almeida was found in the ceiling of the room where the killing took place, and that the fatal bullet had come from the gun of one of the policemen on the scene. Because the prosecution was for felony-murder, this fact could not have affected the determination of guilt. However, the jury also determined punishment, and in this case sentenced Almeida to death. Judge Biggs, speaking for the Court, held that the suppression of evidence favorable to Almeida was a denial of due process, even though it went only to the question of punishment—despite the fact that Almeida's counsel had not requested it and there was lack of proof that the prosecution had suppressed it in bad faith. Judge Biggs noted, "The jury might not have been impressed by the suppressed evidence and could still have imposed the death penalty on Almeida but it cannot be assumed that the jury would have done so." 195 F.2d at 820.

The Third Circuit again dealt with this problem in United States ex rel. Thompson v. Dye, 3 Cir. 1955, 221 F.2d 763, cert. denied, Commonwealth of Pennsylvania v. United States ex rel. Thompson, 350 U.S. 875, 76 S.Ct. 120, 100 L.Ed. 773. Thompson was convicted in Pennsylvania of first degree murder and sentenced to death. Although he admitted the killing, he contended that he was under the in-fluence of alcohol and drugs to such a degree that he could not have formed the necessary intent. An arresting officer, who took him into custody three hours after the shooting, testified that Almeida appeared "perfectly normal in every respect". Several witnesses had testified that Thompson was drinking heavily and smoking marihuana prior to the assault, and that he had the appearance of being intoxicated. The prosecution did not reveal that two eye witnesses, one an officer, had informed the prosecutor that at the time of the arrest the defendant appeared to be drunk. This officer was not called to testify although he was present in the courtroom during most of the trial. Over the assertions of the state that the evidence was not *willfully* suppressed, in that the officers were subpoenaed and therefore available to the defense, although not called by the state to testify, and that the evidence would have been merely cumulative in any event, the court held that Thompson must be given a new trial. The Court ruled that it would be improper to conclude that the jury would not have given greater weight to conclusions of the police than to conclusions of the laymen who testified, and stated that it was not for the prosecution to make the ultimate determination what would be helpful to the defense.[13]

One of the leading cases in this area is Barbee v. Warden, Maryland Penitentiary, 4 Cir. 1964, 331 F.2d 842. Barbee was convicted of the unauthorized use of a motor vehicle and of assault with intent to murder. At his trial his gun was displayed to several witnesses but was not introduced in evidence. Each witness identified it as "similar" to the one which Barbee had used to commit the crime. The defense was not told—and apparently neither was the prosecutor— of police reports showing that the bullet

---

not have attached significance to the evidence favorable to the defendant had the evidence been before it." Griffin v. United States, 1949, 336 U.S. 704, 708–709, 69 S.Ct. 814, 93 L.Ed. 993. On remand, the Court of Appeals stated: "We think it would be too dogmatic." 183 F.2d at 992.

13. See also United States v. Rutkin, 3 Cir. 1954, 212 F.2d 641, and Curran v. State of Delaware, 3 Cir. 1958, 259 F.2d 707, cert. denied, 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353.

recovered from the victim was not fired from that weapon, and that Barbee's fingerprints were not found on the car he was alleged to have used. There were, however, three eye-witnesses who identified Barbee as the assailant. The state contended, in opposition to the petition for habeas corpus, that the undisclosed evidence had no probative value, that Barbee's attorney had not requested it, that the prosecutor had not known of it, and that no prejudice had resulted from the non-disclosure, in view of the other evidence. Chief Judge Sobeloff, speaking for the court, rejected all of these assertions. He stated that the probative value was clear; that the defense counsel was not held to a duty to request information which he had no reason to suspect existed; that the fact that the prosecutor may not have known of it was irrelevant, since it was clear that the police did; and that prejudice had resulted, since it could not be said that the use of this evidence would not have affected the result. Judge Sobeloff stated, "In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel." And, "If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging." 331 F.2d at 846.

This Court dealt with the non-disclosure of evidence in Ashley v. State of Texas, 5 Cir. 1963, 319 F.2d 80, cert. denied, 375 U.S. 931, 84 S.Ct. 331, 11 L.Ed.2d 263. There the two petitioners had been convicted of murder and sentenced to death over their plea of self-defense. Although there was considerable evidence of mental instability, no defense of insanity was made. The district attorney, as a matter of routine practice, had the defendant examined by the County psychiatrist following their arrest. The psychiatrist's report stated categorically that both were "legally incompetent", and this report was submitted to the prosecutor. He never revealed it to the defense. The defense attorney assumed that no such examination had been made, and from the information which he did have, did not attempt to develop an insanity defense. The court held that the petitioners had been denied a fair trial, and that the writ should be issued. Judge Tuttle, for the Court, stated: "We have no doubt that the prosecuting officer, during the trial of these two appellants, conscientiously believed them both to be legally competent. However, it is stretching our credulity to the utmost to ask us to believe that when he received word from Dr. Crowe that he and Dr. Tracktir both considered both appellants legally incompetent, he was not aware of the great, and possibly decisive, significance of such a fact if known to the accused. * * * We conclude that * * * the fact of the opinions of Drs. Crowe and Tracktir, favorable to the defendants, is of such vital significance to the accused persons in planning and conducting their defense, the failure of the District Attorney to inform their counsel of this fact amounts to such fundamental unfairness in the trial of a criminal case as to amount to a denial of due process." 319 F.2d at 85.[14]

United States ex rel. Meers v. Wilkins, 2 Cir. 1964, 326 F.2d 135 is directly in point. Meers had been convicted of first degree robbery over his defense of alibi. Two witnesses who had observed the crime told the police shortly after the event that they had seen the three men who committed the robbery and that Meers was not one of them. Neither person was called as a witness at the trial, and the defense was not told

---

14. "In *Dye*, the prosecutor had falsely told the trial judge that he had several witnesses who would corroborate a prosecution witness' story, and in *Baldi*, defense counsel's request for evidence was met by the prosecutor's untruthful denial that he had it. In pointedly rejecting the opportunity to regard the prosecutor's disclosure of the first prosecution examination as an implied assertion that there were no others, *Ashley* appears to be the first court of appeals decision based squarely on an affirmative duty to disclose information supporting possible lines of defense." Note, 77 Harv.L.Rev. 1528, 1529 (1964).

about them. The witnesses who did testify positively identified Meers as one of the robbers. As Jackson did in this case, Meers moved in the state court for a new trial when after his conviction he found out about the suppressed evidence. This relief was denied to him, as it was to Jackson. Meers was also denied post-conviction relief in the state courts. The federal district court held that the suppression was a denial of due process. The Second Circuit affirmed this judgment on appeal, in an opinion by Judge (now Mr. Justice) Marshall, stating that "it is hard for us to think of any other testimony that might have been more helpful to the defense in establishing its case" than that of witnesses who did not see the defendant. 326 F.2d at 138. The court relied in part on the thoughtful opinion of Judge Palmieri in Application of Kapatos, S.D.N.Y.1962, 208 F.Supp. 883, that also involved the nondisclosure of an eye-witness whose observations conflicted with the prosecution's case. In these cases, as in the instant case, there was no evidence of the prosecutor's bad faith or of overreaching by the prosecution. We too approve the conclusions of Judge Palmieri:

> "The purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty one. The average accused usually does not have the manpower or resources available to the state in its investigation of the crime. Nor does he have access to all of the evidence, much of which has usually been removed or obliterated by the time he learns that he is to be tried for the crime. In view of this disparity between the investigating powers of the state and the defendant, I do not think it imposes too onerous a burden on the state to require it to disclose the existence of a witness of the significance of Danise in the instant case. At the very least, the trial judge should have been made aware of this evidence, and a ruling should have been requested by the prosecutor with respect to his duty in the premises. His unilateral decision

to keep the evidence undisclosed invited the risk of error." 208 F.Supp. at 888.

## II.

■ Applying these principles to the facts here, we hold that the prosecuting attorney was under a duty to disclose to the defense the exculpatory statements of Mrs. Elberty. We need not determine whether this duty arose at the time that Mrs. Elberty was first interviewed by the police. The duty to disclose clearly existed when Mrs. Elberty told the prosecutor during the interview in the witness room that, having seen both the prosecutrix and the defendant, she could positively identify the girl as the one she had seen on the evening in question, but believed that the defendant's complexion was too dark for him to have been the man she saw struggling with the girl.

The State urges that it met its duty when it revealed Mrs. Elberty's name and address to the defendant's attorney before the trial and by subpoena produced her at the trial. But the attorney had not been given a hint as to the exculpatory character of Mrs. Elberty's description of the attacker; the information that she could identify the girl but not the man would tend to make her an undesirable witness for the accused. The prosecution's partially truthful disclosure amounted to affirmative misrepresentation. A defense lawyer cannot be expected to assume that a witness subpoenaed by the State, even if not called to testify, has evidence favorable to the defense.

■ "[B]efore a federal constitutional error can be held harmless, the court must be able to declare [a belief] that it was harmless beyond a reasonable doubt." Chapman v. State of California, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705. In view of Mrs. Elberty's statements that she positively recognized the blonde prosecutrix, that the man she saw was light enough to have been a brother and was lighter than Jackson, that she was a beautician and therefore observant of appearance and complexion, we cannot assume that this evidence would not have

affected the jury's deliberations, had it been made available to the defense. This is especially true when, in view of the alibi defense, identification is a crucial issue and when, under state law, the testimony of the prosecutrix as to identity must be scrutinized, Coker v. State, 83 Fla. 672, 93 So. 176. We cannot allow such error to pass as harmless. In the circumstances of this case, the nondisclosure of the evidence favorable to the defense, even when there was no showing of the prosecution's bad faith, offends the fundamental conceptions of a fair trial essential to due process.

The judgment of the district court is reversed and the cause remanded with instructions that the writ prayed for should issue and Jackson be released without, of course, precluding a new trial by the State of Florida, should it elect to re-try him.