**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ernest Ralph POOLE, Defendant-
Appellant.**

**No. 15475.**

United States Court of Appeals
Seventh Circuit.

May 16, 1967.

Rehearing Denied July 6, 1967.

Joseph Cohn, E. St. Louis, Ill., for appellant.

Carl W. Feickert, U.S. Atty., Joel A. Kunin, Asst. U.S. Atty., E. St. Louis, Ill., for appellee.

Before KNOCH, KILEY and CUMMINGS, Circuit Judges.

KILEY, Circuit Judge.

Poole was convicted by a jury of violating the so-called Lindbergh Kidnaping Law [1] and was sentenced to twenty years' imprisonment. We reverse and remand for a new trial.

On the night of May 18, 1965, Richard Keller drove his date from their home city, Chaffee, Missouri, to "The Little Villa," a tavern in McClure, Illinois, where they had some drinks and stayed until about 1:30 a. m. When they left The Little Villa, they met Poole, who assisted Keller in getting his car started and in return was given a ride by Keller to Poole's stated destination at Cape Girardeau, Missouri. Upon arrival there, Poole displayed a knife and told Keller to keep driving. Subsequently, Poole forced Keller to relinquish the wheel, and after driving through Charleston, Missouri, forced Keller from the car at knife point. Poole kept the girl in the car and drove her back into Illinois.

According to the girl's testimony, Poole's first stop was about 4:00 a. m. at a tavern in Cairo, Illinois, where he left her in the car for a few moments while trying unsuccessfully to obtain liquor. The girl testified that Poole stopped at a roadside park about 4:15 a. m. and that she had sexual intercourse with him twice for fear that he would harm her. The girl testified that after leaving there they stopped at a gas station. They later stopped in a cafe in Pinckneyville, Illinois, where the girl asked employees to call the police. Poole was arrested at the cafe about 6:00 a. m.

The indictment charged that Poole knowingly transported the girl across the Missouri-Illinois state line and unlawfully held her for the purpose of "taking possession and control of the automobile in which [the girl] was * * * a passenger, and for the purpose of providing [Poole] with the means of transportation." The indictment also alleged that Poole did "then and there assault, rape and ravish" the girl and "did not liberate her unharmed."

Poole contends that he was deprived of due process because of the govenment's failure to produce an FBI report of the girl's physical examination which he claims to be favorable to him. We need not reach this constitutional issue. We reverse under our supervisory power because of the government's failure to disclose the report. McNabb v. United States, 318 U.S. 332, 340–341, 63 S.Ct. 608, 87 L.Ed. 819 (1943); United States v. Consolidated Laundries Corp., 291 F.2d 563, 571 (2d Cir. 1961). [2]

At the preliminary hearing about three and one-half months before Poole's trial, the girl testified that she had been given a physical examination by a "Dr. Green" in Pinckneyville, Illinois, shortly after Poole's arrest. In fact, she had been examined by Dr. Eugene Stotlar in that town. Government counsel, who should have known the name was Stotlar and not Green, did not correct this inaccuracy, and Poole's court-appointed counsel failed to locate "Dr. Green." Thereafter, defense counsel did not try to obtain any further information about the examination from the government.

No doctor's name appeared on the list of witnesses given to defense counsel, though the government listed the FBI agent who took Dr. Stotlar's statement. At the trial, counsel objected to testimony by the girl about the examination on grounds of hearsay.

Neither the agent nor the doctor was called to testify at the trial. The govern-

1. § 1201. Transportation
    (a) Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed.

2. For a discussion of the supervisory power of federal courts, see 76 Harv.L.Rev. 1656 (1963).

ment's proof of the kidnaping and rape charges rested primarily on the testimony of the girl and Keller. Poole did not take the stand in his own defense. The only evidence introduced by him consisted of several letters attesting to his credit standing and performance as an employee.

The defense theory as expressed in counsel's[3] opening statement to the jury was that the girl was not kidnaped since the "abduction" was not against her will. The main theme of his cross-examination of the girl was that she was willing to be Poole's companion.

Under cross-examination, the girl told of having started drinking at age sixteen and of having "four" Tom Collinses before leaving The Little Villa on the night in question. She admitted that it made no difference whether she came home at 1:30 or 3:30 a. m.; that after Keller was put out of the car until they arrived at the bar near Cairo, Poole did not have the knife in his hand but had both hands on the wheel; that on the way to Cairo she was sitting next to him; that "right outside" Cairo he discussed having sexual relations with her and when they arrived at the roadside park fifteen or twenty minutes later, she had already disrobed; that Poole was hugging her en route to the park and she had kissed him; that they had intercourse twice and that it "was not painful in any way"; that the car was parked about "three or four feet" from the road; that she told Poole they had better go because she didn't want anyone to see her out there; that at the service station she left the car to go to the restroom and when she came out Poole was in the station paying the attendant; that she was able to drive and was standing at the car door when Poole was in the station; and that earlier, in Cairo, she was alone in the car when Poole tried to get liquor. On cross-examination, a waitress at the cafe in Pinckneyville testified for the state that she noticed nothing unusual about the girl when she took the order, and that the girl was not crying.

In his final argument, Poole's attorney urged this favorable testimony upon the jury in support of his request that the jurors ask themselves whether the girl's "accompaniment" with Poole was a "forced" or "abducted one" or the result of her own "volition," "desire" or "nature." He asked, "Where are the FBI agents * * * who investigated this case?" referring to the agent who was listed as a witness. He asked, "Where is the doctor?" and argued that the doctor could have proved "whether or not there has, in fact, been an act of sexual intercourse." He stated that the doctor would have brought out the truth about the girl's "serious accusations."

Shortly after the jury rendered its verdict, defense counsel learned from government counsel that the government possessed a written FBI report[3] of Dr. Stotlar's examination which disclosed no evidence of the girl's having had sexual intercourse:

Dr. EUGENE STOTLAR, Medical Arts Building, Pinckneyville, Illinois, advised that he examined [the girl] in his office on May 19, 1965. He stated that the examination consisted merely of a routine pelvic examination. He stated that the examination revealed no evidence of semen, sperm or secretions of any kind in the vagina. He stated also that there was no other way of determining if [the girl] recently had sexual intercourse. He stated that a smear test, if taken, might have revealed sperm or semen in the linings of the vagina. He stated, however, that he examined her primar-

3. It was not argued whether the report itself would have been discoverable under the version of Fed.R.Crim.P. 16 then in effect. See Giles v. State of Maryland, 386 U.S. 66, 101, 117, 87 S.Ct. 793, 17 L. Ed.2d 737 (1967). We need not discuss this, however, since even if the govern-ment did not have a duty to produce the report upon request, it had a duty to disclose information favorable to Poole in its possession. On discovery under the new rules, see Rezneck, The New Federal Rules of Criminal Procedure, 54 Geo.L.J. 1276, 1277–80 (1966).

ily to determine if she had been bodily harmed and he could find no evidence of injury or bruises. He stated that the examination took place abut 9:00 a. m. or 10:00 a. m., which was eight [sic] hours after the intercourse supposedly took place. [According to the girl's testimony, the correct time differential would be five to six hours.]

■ There can be no claim on this record that government counsel's conduct was in bad faith or violated the standards of due process laid down in Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[4] In the absence of such conduct, a showing of prejudice has generally been a prerequisite for relief in collateral proceedings on a claim of failure to disclose unrequested exculpatory information. See, e. g., Kyle v. United States, 297 F.2d 507 (2d Cir. 1961).[5] Whether prejudice resulted to Poole from the failure to disclose this information concerning Dr. Stotlar's examination is difficult to ascertain. We think Poole's burden of showing prejudice on appeal, as distinguished from the burden in collateral proceedings, is satisfied by the serious doubt we have that he received a fundamentally fair trial, free from prejudice.

Our doubt as to fairness stems from the government's theory of the case as expressed in the somewhat awkward phrasing of the indictment. Under the charge, rape was not an element of the crime. It related solely to the issue of whether the victim was liberated unharmed, and consequently the evidence of rape could be considered by the jury only as a basis for considering whether the kidnaping was aggravated as charged.

We do not question the sufficiency of the indictment, but its theory may well have led to some confusion of issues in the jury room. In view of all the evidence, the alleged purpose of the kidnaping, transportation, seems to be incidental. There was no contention that Poole held the girl as a "hostage," and the holding of the girl did not seem to contribute substantially to Poole's success in obtaining transportation. Poole himself was the driver of the car and apparently was familiar with the area. On the other hand, much of the testimony concerned the issue of rape, and this, not illogically, may well have seemed to the jury to be the purpose of the kidnaping, in spite of the court's instructions on the point.

Government counsel expressly refrained from asking for the death penalty, and the jury's verdict read "guilty as charged in the indictment," with the lines provided for a recommendation left blank. The district judge did not instruct the jury to use a special verdict. Thus, the form of the verdict hides whatever prejudice may have resulted from the failure to disclose the medical information relevant to the defense. The verdict could mean that the jury found there was kidnaping but no intercourse, kidnaping with consensual intercourse or kidnaping and rape but not deserving death. The district court took the verdict to mean the last of these, for in rendering judgment on the verdict, it used the language of the indictment, including the charge of rape.

■ Under these circumstances, we think the interests of truth, and of the defendant, would have been served materially if the report had been disclosed. It could have led to calling the doctor to testify, and perhaps to calling the FBI agent in rebuttal. In any event, the report bore materially on the important issue of the girl's credibility. If the jury found a reasonable doubt of intercourse, it may have rejected all of the girl's testimony and found a reasonable doubt about

---

4. The Supreme Court recently declined to rule on the extent of the government's constitutional duty to disclose unrequested exculpatory information. Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

5. For a discussion of the recent cases involving the nondisclosure of exculpatory information, see 42 Notre Dame Lawyer 270 (1966).

the forced abduction. The probable effect of the failure to disclose the report cannot be limited to the question of punishment.

█ It is true, as the government argues, that defense counsel was not diligent in following up the information obtained at the preliminary hearing, despite its inaccuracy. The government failed to correct the misinformation, however, and we think under these circumstances Poole should not suffer for the mistakes of his counsel.[6] Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966); Barbee v. Warden, 331 F.2d 842, 845 (4th Cir. 1964); cf. Ingram v. Peyton, 367 F.2d 933, 936 (4th Cir. 1966).

Balancing the factors of the availability of the evidence and conduct of government counsel against the probability of prejudice, we think the failure to disclose the report denied Poole a fundamentally fair trial. The interest of the government in the integrity of the criminal process weighs heavily in the balance against its interest in avoiding a retrial in this case. It had no interest, security or otherwise, in not disclosing the report. Giles v. State of Maryland, 386 U.S. 66, 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (concurring opinion of Justice Fortas). We are aware that the exercise of our supervisory power here has a substantial, although indirect, effect on the executive branch of government. But we are impelled to use it to protect the integrity of the criminal fact-finding process.[7]

Several other irregularities occurred at Poole's trial. In his closing argument to the jury government counsel argued that testimony as to the alleged purpose of the kidnaping, transportation, stood "uncontradicted." Even though this referred to an item of testimony which could have been contradicted by one of the two witnesses, it could have called attention to Poole's failure to testify on any issue—

and thus to his failure to contradict much of the testimony which could not have been contradicted by anyone but him. Desmond v. United States, 345 F.2d 225, 14 A.L.R.3d 718 (1st Cir. 1965).

Government counsel stated that he "hoped" there would be no reasonable doubt in the jurors' minds after hearing the evidence. He also said: "We are not waving a flag before you by * * * bringing a boy [Keller] back from Viet Nam who has been fighting, on a case of this nature. He did his duty. He came back here to testify before you ladies and gentlemen." Government counsel closed his rebuttal argument by asking the jury to "consider the fate of society at the hands of Ernest Ralph Poole, and consider yourself and your children."[8] We do not discuss whether these improprieties constitute reversible error. We comment on them in aid of Poole's new trial.

We extend our thanks to Mr. Joseph Cohn, court-appointed counsel, for his conscientious representation of appellant in this court.

Reversed and remanded for a new trial.

KNOCH, Circuit Judge (dissenting).

I would affirm the conviction. When he failed to locate a "Dr. Green", I would expect defense counsel to address inquiries to the government.

If we are not prepared to say that the government counsel's conduct (in failing voluntarily to disclose the correct name of the examining physician) violated the standards of due process, then I think we should not reach the same practical result through the exercise of our supervisory power. Nor in my opinion, can we presume, as the majority opinion in effect does, that the testimony of the examining physician would have been helpful to the defense.

---

6. There can be no claim here that defense counsel knowingly "elected" not to use the defense suggested by the report. See Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d at 292 (dissenting opinion).

7. See 76 Harv.L.Rev. 1656, 1663–64 (1963).

8. Defense counsel objected to all of these remarks except that pertaining to government counsel's "hope."