Jesse LUNA, Appellant,

v.

Dr. George J. BETO, Director, Texas Department of Corrections, Appellee.

No. 23813.

United States Court of Appeals
Fifth Circuit.

May 7, 1968.

John J. Browne, Houston, Tex., for appellant.

Lonny F. Zwiener, Asst. Atty. Gen., Austin, Tex., Joe S. Moss, Asst. Dist. Atty., Houston, Tex., Waggoner Carr, Atty. Gen., of Texas, Hawthorne Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., Howard M. Fender, Asst. Atty. Gen.,

Crawford C. Martin, Atty. Gen., of Texas, George M. Cowden, First Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., R. L. Lattimore, Austin, Asst. Atty. Gen., for appellee.

Before JOHN R. BROWN, Chief Judge, and RIVES, TUTTLE, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON and CLAYTON, Circuit Judges.

DYER, Circuit Judge:

The facts of this habeas corpus case *now before the court en banc\** are fully and succinctly stated in this court's opinion on original hearing.[1] For convenience, they are reproduced here:

> Luna was convicted in the Criminal District Court of Harris County, Texas, of the offense of selling heroin and was sentenced to imprisonment for 25 years. The judgment of conviction was affirmed by the Court of Criminal Appeals of Texas.[1] As

1. Luna v. State of Texas, Tex.Crim.App. 1965, 387 S.W.2d 896.

> shown in the opinion of that court, the sale of the narcotic drug was alleged to have been made to John William Gober, an ex-convict. That opinion details how Gober was the principal witness for the State and his testimony as to effecting the sale was corroborated by officers Hightower and McMannes, who observed him from a distance with field glasses. Luna's application for habeas corpus to the Texas Court of Criminal Appeals was denied without opinion on November 9, 1965. On February 9, 1966 Luna filed his application for habeas corpus in the federal district court. The principal grounds for his application are: (1) The State knowingly permitted the witness Gober to testify

* Judge Rives, a Senior Judge, was a member of the panel delivering the initial opinion and is therefore qualified to sit on the rehearing en banc. See Allen v. Johnson, 5th Cir., 1968, 391 F.2d 527 (en banc) [February 9, 1968]. This is one of six cases submitted en banc to the Court at Houston set forth in *Allen.*

1. Luna v. Beto, 5 Cir., 1967, 391 F.2d 329. [No. 23,813, July 11, 1967.]

falsely. (2) The State knowingly suppressed evidence beneficial to the defendant Luna. (3) The State Court at the instance of the prosecuting attorney denied the defendant Luna his right adequately to cross-examine the witness Gober. After a full hearing, the district court entered an able opinion and denied the application for habeas corpus.

\* \* \* \* \* \*

All three of the grounds for the application are based upon the following parts of the cross-examination of the witness Gober:

"Q. You certainly have no official capacity with the Houston Police Department, do you—are you a police officer?

"A. No sir, I'm not.

"Q. You have no official capacity with them, do you, Gober?

"A. No sir, I do not.

"Q. Are you paid by them?

"A. No sir.

"Q. Now, Gober, you admitted on the stand, in answer to questions, that you have been convicted of the crime of murder without malice in 1955, is that correct?

"A. Yes sir.

"Q. You have been charged \* \*.

"MR. STOVER: Your Honor, I object to any questions about what this man had been charged with. Convictions are all that he can ask him about as Counsel well knows.

"MR. TUCKER: I want to ascertain the number of charges that was in Harris County, Your Honor.

"THE COURT: Just convictions, please. You know rules.

"MR. TUCKER: Yes, Your Honor.

"MR. TUCKER CONTINUES:

"Q. I ask you if you have been convicted of burglary and felony theft here?

"A. Yes sir.

"Q. What other indictment—have you been under any other indictments?

"MR. STOVER: I object to that, Your Honor, and ask that Counsel be instructed to abandon this line of questioning.

"THE COURT: That is sustained.

"MR. TUCKER CONTINUES:

"Q. How long have you been working with or for the Houston Police Department?

"A. I haven't been working with the Houston Narcotics Squad, the Police Department Division, since sometime in July, the middle of July.

"Q. Are you addicted to the use of narcotics?

"A. No, I am not.

"Q. You are not addicted to the use of narcotics?

"A. No sir.

"Q. How many cases have they filed on you—do they have over you right now?

"A. I don't have any pending cases against me.

"Q. How many times have they caught you with narcotics?

"MR. STOVER: I object to that—it would be immaterial.

"THE COURT: That is sustained.

"MR. STOVER: Counsel well knows the rules, Your Honor, and I am going to object to his continuing \* \* \*.

"THE COURT: Counsel, please pay attention—you know what is admissible, and you know what is not admissible. Please don't ask any more questions along that line.

"MR. TUCKER: Yes, sir, Your Honor."

The undisputed facts reveal that when Gober was arrested for a felony—the unlawful possession of narcotics, he was promised by police officers that, if he would cooperate by obtaining evidence

against narcotic peddlers,. the police officers would "give him whatever help they could with his case." Gober agreed and was released on bond. For several months he assisted the police by purchasing narcotics from peddlers. The appellee admits that at times officers advanced to Gober small sums of money.[2]

2. The amounts ranged from $3.00 to $5.00, and one officer testified that considering the number of days Gober spent assisting the police investigators, the sums advanced were not enough to compensate him for the time he was absent from his regular job.

Gober testified at the trials of several defendants, including Luna, who were arrested for selling narcotics to Gober. Luna's case was the first to be brought to trial.

The majority of the panel which originally heard this case on appeal, relying on Barbee v. Warden, Maryland Penitentiary, 4 Cir. 1964, 331 F.2d 842, was of the opinion that a writ should be granted because the State knowingly allowed Gober to testify falsely and knowingly suppressed evidence favorable to Luna. A majority of that panel also held that there was no merit in Luna's contention that the State court had denied him the right to an adequate cross-examination of Gober. Upon rehearing en banc, we are of the opinion that the District Court's denial of a writ of habeas corpus should be affirmed.

Perjury is "The willful assertion as to a matter of fact, opinion, belief, or knowledge, made by a witness in a judicial proceeding * * * upon oath * * * such assertion being material to the issue or point of inquiry

2. Black's Law Dictionary, p. 1297 (4th ed. 1951).

3. Appellant's brief, p. 5.

4. General and Special Laws of Texas, Acts 1951, 52d Leg., p. 814, ch. 458, § 1, codified as Article 732a of Vernon's Annotated Texas Code of Criminal Procedure and brought forward as Article 38.29 of the 1965 Code of Criminal Procedure of Texas. That section read:

The fact that a defendant in a criminal case, or a witness in a criminal case, is, or has been, charged by indict-

and known to such witness to be false."[2] Accord, Blackmon v. United States, 5 Cir. 1940, 108 F.2d 572. Viewed in this light we are convinced that there is no merit in appellant's contention that "the State knowingly used perjured testimony to deprive Appellant of a fair trial."[3] Witness Gober was asked *"Are* you paid by them?" (Emphasis added.) He answered, "No sir." This answer was true since Gober had not, as he testified, worked with the police for several months before the trial. Gober was later asked "How many cases have they filed on you—do they have over you right now?" He answered that he had no "pending cases," In fact, a complaint had been made against him for possession of narcotics. However, in determining whether this answer constitutes perjury as appellant urges, the materiality of the answer and Gober's knowledge that the answer was false must be considered. "Materiality is determined by whether the false testimony was capable of influencing the tribunal on the issue before it." Blackmon v. United States, supra at 573. Under the circumstances of this case, it is clear that the false answer was not material. In the context in which the question was asked, i. e., a direct attack on Gober's credibility, the answer was not admissible in evidence. Under Texas law in effect at the time of appellant's trial, only convictions could be used to impeach a witness in a criminal case.[4] Evidence of pending charges is admissible in Texas for the limited purpose of showing bias, prejudice and motive of a witness. E. g.,

ment, information or complaint, with the commission of an offense against the criminal laws of this State, or the United States, or any other State shall not be admissible on the trial of any criminal case for the purpose of impeaching any person as a witness unless on trial of such indictment, information or complaint a final conviction has resulted, or a suspended sentence has been given and has not been set aside, or such person has been placed on probation and the probation has not expired.

Blake v. Texas, Ct.Crim.App.1963, 365 S.W.2d 795; Kissinger v. Texas, Ct. Crim.App.1934, 70 S.W.2d 740. However, in the case *sub judice,* appellant made no attempt to inform the court that the testimony was sought to show bias or motive.[5] Furthermore, it is clear beyond a reasonable doubt, Chapman v. State of California, 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 that this testimony would not have influenced the jury on the issue of appellant's guilt *vel non.* Gober admitted both on direct and on cross-examination that he had been *convicted* for murder without malice, for burglary and for felony theft. Thus the evidence that Gober had been *charged* with the less serious offense of possession of narcotics was merely cumulative on the issue of his credibility. It did not go to the heart of the offense, as was the situation in Barbee v. State of Maryland, supra, or in our recent case of Jackson v. Wainwright, 5 Cir. 1968, 390 F.2d 288 (slip opinion February 26, 1968). We are convinced that no jury would disbelieve a witness who admitted to being a burglar, a thief and a murderer simply because he had also been charged with possessing narcotics.

■■ When Gober was charged with violating the State narcotics laws, he was released on bond. No hearing was ever held—the police having twice requested and received a postponement. Gober was never made to appear before any court in connection with the charge. Under Texas law, the failure to present an indictment or information during the term of court next after a defendant has been released on bail relieves him and his sureties from all liability on the bond.[6]

The crucial term of court had ended before Gober testified at appellant's trial, and he had thus been released from liability on the bond. This, we think, negates any inference of willful falsity by Gober and suggests that as a man "versed" in the "practicalities" of criminal law, he may well have considered that the charges had in fact been dropped. Therefore, it cannot be said that either answer constituted perjury.

■ Appellant next urges that a writ must be granted because in his case, as in Barbee v. Maryland, supra, the State "wilfully suppressed evidence that was favorable to Appellant."[7] Appellant's argument here is closely related to the point previously discussed. However, even accepting *arguendo* appellant's contention that the pending charge against Gober for possession of narcotics was "suppressed evidence," we are convinced that *Barbee,* although having surface appeal, is upon close analysis inapposite to the situation before us because, as discussed below, the suppressed evidence in *Barbee* differs from that in this case. In *Barbee* the evidence was of such a nature that its suppression amounted to an unconstitutional denial of due process. The suppressed evidence there was clearly exculpatory in that it consisted of a fingerprint test which showed that Barbee's fingerprints did *not* match those found in the car driven by the assailants, and of a ballistics test which showed that Barbee's gun, exhibited to witnesses at trial, had *not* fired the shot that wounded the police officer. The Court found that this evidence had "substantial evidentiary significance."[8] As previously demonstrated, the evidence in-

---

5. A much more difficult case would have been presented had appellant's counsel been prevented from eliciting answers to questions such as: "Why are you testifying today?" "Did the police make a deal with you to drop pending charges against you if you would help them?" Gober testified in subsequent narcotics cases where this type of question and Gober's answers thereto were allowed.

6. Article 436, Vernon's Annotated Texas Code of Criminal Procedure, brought for-

ward as Article 22.13 of the 1965 Texas Code of Criminal Procedure.

7. Appellant's Brief, p. 5.

8. The undisclosed evidence in our recent case of Jackson v. Wainwright, supra, was also highly relevant to the basic question of guilt or innocence. It consisted of a witness who was certain that appellant, a dark negro could *not* have been the rapist since the man she had seen was not a dark skinned negro.

volved in the instant case was merely cumulative on impeachment and had no direct relation to appellant's guilt or innocence. In *Barbee* the Court attached no significance to counsel's failure to request the reports because this was "not a case where defense counsel merely made a wrong tactical calculation; it is a case where the inference strongly projected by the state's evidence might have been destroyed by other evidence in its possession but which the police concealed * * *." Id. at 846. Here the evidence was merely cumulative in nature. It would not have destroyed any inference raised by the state's evidence, for it would be ludicrous to suggest that a charge of possessing narcotics would impair the image of an admitted murderer, burglar and thief. Here, as in *Barbee*, there is no evidence that the prosecutor knew that evidence was being suppressed. The Fourth Circuit imputed the knowledge held by the police to the prosecutor because "the police allow[ed] the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradict[ed] this inference * * *." Id. at 846. Our situation is vastly different. The evidence was not elicited by the prosecutor but by appellant's counsel. The police were not in the courtroom when Gober testified (the Rule had been invoked) so they had no way to know of or to correct Gober's statements. Furthermore, in *Barbee* the court stated that it could not "condone the attempt to connect the defendant with the crime by questionable inferences which might be refuted * * *." Id. Here, the undisclosed evidence did nothing to connect appellant with or absolve him from the crime. Finally, the *Barbee* court considered the matter of prejudice. It refused to consider that the reports might not have influenced the jury because this was a case "where evidence was withheld by the police which had a direct bearing upon and could reasonably have weakened or overcome testimony adverse to the defendant. * * *" Id. at 847. Here the evidence had no such direct bearing, and as discussed supra we are firmly convinced that the evidence, in any event, would not have affected the result.

Appellant's conviction is not constitutionally infirm. The judgment of the District Court is

Affirmed.

JOHN R. BROWN, Chief Judge, with whom Circuit Judges GEWIN, BELL, THORNBERRY, COLEMAN, AINSWORTH, SIMPSON, and CLAYTON join, concurring specially:

I concur fully in the Court's opinion and the result. Some comments in the dissenting opinion warrant some emphasis.

The dissenting opinion deplores what it senses is undue emphasis by the Court on the so-called technicalities of perjury, presumably Texas peculiarities, even though its concepts seem to be those everywhere held. But for an otherwise valid state conviction to be upset years later on federal habeas, surely something more than an evidentiary *mistake* must be shown. If *mistake* is enough, then never, simply never, will the process of repeated, prolonged, postconviction review cease. For in every trial, or at least nearly every trial, there will be, there are bound to be, some mistakes.[1]

---

Therefore, neither *Jackson* nor the cases discussed therein (all involving evidence bearing directly on the guilt or punishment of the accused) are determinative of the cause under consideration.

1. Consider, for example, a defense of alibi refuted factually by a witness positively identifying the defendant and then rejected by the jury's verdict of guilty.

Five years later post-conviction proof demonstrates conclusively that the identification was erroneous although maintained by the witness, the police, and the prosecution in all good faith as the truth. This would, of course demonstrate that the result was wrong. But it would not demonstrate that the trial was unfair. The Federal Constitution could not correct that mistake.

What elevates the "mistake" to a constitutional plane is at least two-fold. First, the mistake must be material in the sense of a crucial, critical, highly significant factor. Second, it must have some State complicity in it. As to this, I do not for a moment think innocence of the prosecutor is an assured out. For *Barbee* properly teaches that the police are very much a part of the State and its prosecutorial machinery. But someone in the state machinery must have some awareness that testimony being palmed off as the gospel is something else indeed.

On these scores there is nothing to the assertion of "perjury" or "falsity." First, the interrogator chose to cast his questions in conclusory terms. Phrasing the question first, "Q. How many cases have they *filed* on you * * *?", the examiner almost instantaneously pin-pointed it to the instant present— "* * * do they have *over you right now?*" To this conglomerate of conclusions, the witness answered in like terms: "A. I don't have any *pending* cases against me." It turns out, of course, that under Texas law, for all practical purposes Gober had no "pending" cases.[2] So far as this formal charge was concerned, Gober was as free as the birds. While it may be true that new charges could be filed, or an indictment returned within the statute of limitations period, none had been, and to this date, none ever has been. One simply cannot make this negative reply a *falsity* merely because, had the questions been framed differently or the matter pursued to an obvious end for a counsel bent on questioning or hopefully destroying credibility, the witness would have had to state that new charges could be filed or an indictment returned. By the dissent perjury is first watered down to falsity, and then both

are brushed aside by a statement of what all of us as Judges know concerning the possibility of new charges or indictments but as to which the witness was never interrogated. Worse, the only way to reach the conclusion that the witness was being interrogated along these shadowy, vague, unidentifiable lines is to make the triple assumption that (1) the interrogator had that in mind, (2) the witness knew the interrogator had that in mind, and (3) the witness by no inadvertent slip gave a known wrong answer.

Second, there is nothing to implicate the State in this in any way. The prosecutor in the courtroom was ignorant of the original charges. The police officers who would have had knowledge were out of the courtroom under the Rule.

On a like approach the charge that the "State knowingly suppressed evidence beneficial to the defendant Luna" or, stated more advantageously to the petitioner, the State failed to furnish information helpful to the defendent, turns out equally to be lacking in constitutional substance.

The assertion here is that in the testimony of Gober, the State misled the defendant because the testimony did not reflect the connection between Gober, as an informant, and the State. Emphasis is placed on his negative answer to the question "Are you paid by them [the Houston Police Department]?"

Here again the answers stated in terms of the present were literally true. He had no "official capacity with the Houston Police Department," he was not "a police officer", and he was not "paid by them" in the sense of being a salaried employee. On the other hand, it was perfectly clear that he had been "working with or for the Houston Police De-

---

2. This point on the effect of expiration of the court term without the return of an indictment was advanced for the first time in the forcefully able brief and argument of the Assistant District Attorney to the Court en banc. Lacking this guidance, the initial panel was, of course, entitled to assume that the formal charge was viable.

partment." Indeed, Gober went further and pinpointed the time by stating that he had not worked with the Houston Police Department "since some time in July, the middle of July."

From the circumstances of the sale of narcotics by Luna to Gober, Gober's familiar role in the "making" of the sale and purchase and Gober's accurate answers to the questions as put to him, it was perfectly evident to anyone having any experience that Gober obviously was being used by narcotics officers[3] in the enforcement of these important laws. No matter how much one might deplore the necessity for the use of informants and who up the limits of entrapment "stage" cases for a successful prosecution, this is both a well known and judicially acceptable phenomenon. And except for those possible and rare instances in which the detested role of informer is taken on out of a penitent conversion, the practice rests upon the advantages which the informer gets, or thinks he gets, at the hands of the sovereign. It may be, and often is, money—not only little handouts, but, as this Court has expressly approved, a contingent fee arrangement in which even the National sovereign is allowed to pay bounty on a sliding scale depending on the number of convictions the "special employee" brings about.[4] In others, the advantage can be an indulgence either by police officers or, for that matter, persons as elevated in the hierarchy as the Attorney General of the United States[5] toward the prosecution or even the commencement of criminal proceedings against the

informant for his known criminal actions. In others it takes a middle course in which on arraignment and acceptance of a co-defendant's plea of guilty the Court acquiesces in the prosecutor's recommendation for a dismissal of most charges, reduction in the offense, and postponement of sentence with its telltale message that punishment may well depend on how well the penitent performs and the prosecution succeeds.

In the light of this record, there was a vivid revelation of Gober's relation to the State in the prosecution and trial of this case (see note 3 supra). Once we assume that _Gideon's_[6] trumpet heralds the importance of counsel because of professional knowledge and skill beyond the experience of the non-lawyer, no one worthy of the Bar could have claimed even remotely any surprise as to Gober's connection with the case, the role he was playing and the whole gamut of influences—monetary, physical, emotional, or psychological—which might be at work in his helping, if not instigating, the efforts of the police. Spread out over the whole record for all to see and the skilled lawyer to pursue was Gober's relationship. Unless, even though counsel is present and performing, the Federal habeas later look-back has to assume professional ignorance bordering on incompetence and an unawareness of what is going on bordering on mental unconsciousness, the defendant through his counsel knew all that the dissenters insist the State should have revealed. Perhaps it was a _mistake_ for counsel not to have pursued it. But the _mistake_ was not

---

3. See the recitation of facts, Luna v. State of Texas, Tex.Crim.App., 1965, 387 S.W. 2d 896, set out at length in the dissenting opinion: Gober calls officer Hightower. Gober played it easy to get time to contact officer Hightower at the Pigstand drive in, where Hightower, first searching Gober, furnished $21.00 to Gober. At the exchange of money for capsules Hightower and officer McMannes had Gober under continuous surveillance followed by search of Gober and delivery of narcotics to the officers.

4. Williamson v. United States, 5 Cir., 1962, 311 F.2d 441, affirmed after retrial, 340 F.2d 612; Bullock v. United States, 5 Cir., 1967, 383 F.2d 545; Hill v. United States, 5 Cir., 1964, 328 F.2d 988.

5. United States v. Cox, 5 Cir., 1965, 342 F.2d 167, (en banc) cert. denied sub nom. Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700.

6. Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

due to being mislead by appearances or ignorance of the real situation. The mistake—and as a tactical judgment of counsel in the heat of trial it may well not have been a mistake at all—was in counsel not following up the obvious.

The opportunity for full exploration was there. The certainty that Gober was acting out of supposed self-interest was patent. The failure to press on, the failure to pursue relentlessly was not from a State sponsored, State instigated or State permitted deficiency. Rather it was from a decision—deliberate or unconscious—by counsel. But that cannot make the trial unfair or afford to this defendant release in the high name of the constitution.

RIVES, Circuit Judge, with whom Circuit Judges WISDOM, GOLDBERG and GODBOLD join, dissenting:

In our original opinion we had referred to the opinion of the Court of Criminal Appeals of Texas[1] with the statement

"That opinion details how Gober was the principal witness for the State and his testimony as to effecting the sale was corroborated by officers Hightower and McMannes, who observed him from a distance with field glasses."

Luna v. Beto, 5th Cir. 1967, 391 F.2d 329. The central connection of Gober with Luna's conviction is of such importance that I now quote the facts as succinctly stated by the Texas Court:

"The offense is the sale of heroin; the punishment, 25 years.

"The count of the indictment upon which the case was submitted to the jury alleged the sale of a narcotic drug, to-wit, heroin, to William Gober.

"Gober, an ex-convict, testified that on August 30, 1963, the date alleged in the indictment, he was at an Icehouse-Beer Parlor drinking beer.

About 1 o'clock P.M. the appellant and one Robert or Bobby Ortega drove up.

"In a conversation between them appellant asked Gober if he 'wanted to score' and Gober said he probably would in a little while.

"Appellant said he would have 'some stuff' ready shortly, and left.

"Gober finished his beer and called Police Officer Hightower.

"About 3 P.M. appellant again came to the beer parlor and told Gober that he had 'some stuff' over on James Street under a house, and asked Gober if he was ready to buy. Gober replied that he had to go around the corner and would be back and appellant said he would wait in Ortega's car, 'and he asked me how long it would be before I would be back and be ready to buy this heroin,' and Gober replied that it would just be a few minutes.

"Gober then went to a Pig Stand on North Main where he met Police Officer Hightower and McMannes who, after searching him and the front part of his car, gave him $21.00. Gober then drove back to the Icehouse where appellant and Ortega were sitting in Ortega's tan Chevrolet car. Upon signal from appellant, Gober followed the Chevrolet driven by Ortega to a place in the 400 block of James Street where the Chevrolet car stopped and Gober drove up directly behind it and got out of his car.

"Appellant went across the street and crawled under a house. In a matter of seconds he came out and walked up to Gober and said 'Where's the money?' Gober got the $21.00 out of his pocket and gave it to appellant in exchange for three capsules which appellant took from a package.

"Gober further testified that Officers Hightower and McMannes, in an unmarked car, followed him from the time they gave him the $21.00, and

1. Luna v. State of Texas, Tex.Cr.App.1965, 387 S.W.2d 896.

that after appellant received the money and drove away Officer Hightower followed as he drove to a secluded area near some warehouses where he gave the capsules he had bought from appellant to Officer McMannes and they again searched him and searched his automobile.

"Officer Hightower, assigned to the Narcotics Division of the Houston Police Department, testified that he received a call from Gober, went with his partner, McMannes, to the Pig Stand dressed in plain clothes, where they had a conversation with Gober; searched him and his car and advanced him $21.00 'of official city funds' with instructions.

"Officer Hightower further testified that he and his partner followed Gober to the icehouse, where he saw appellant with his arm out the window of the car driven by Ortega, and continued following both cars to the 400 block of James Street. He testified that from a distance of a block and a half, using field glasses, he saw appellant go to the house at 411 James and return to where Gober was standing; saw Gober hand appellant some money and appellant, in return, hand Gober something.

"Also he testified that he and his partner followed Gober to the pre-arranged meeting place where Gober gave Officer McMannes three capsules and they again searched him and his car, and returned the money they had found in his pocket when they first searched him.

"Floyd E. McDonald testified that he ran an analysis on the contents of the three capsules identified as State's Exhibit No. 1 which revealed that each contained about one gram of 26.4 percent pure heroin, a narcotic drug."

Luna v. State of Texas, supra note 1, 387 S.W.2d at 896, 897.

Gober was the only witness as to what occurred between him and Luna, except for the rather meagre corroboration from Officer Hightower. There was no circumstantial corroboration, such as the finding of marked money in Luna's possession. We can only speculate as to how thorough a search of Gober's car was made. Gober's testimony was that they searched "the front part of his car." Nor can we be certain as to how much occurred outside of the officers' observation "from a distance of a block and a half, using field glasses." Very clearly Luna's conviction would not have been possible without Gober's testimony. To find Luna guilty, the jury must have believed Gober beyond a reasonable doubt.

On en banc rehearing, however, the majority find that the test of Chapman v. State of California, 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 has been met, and that it is clear beyond a reasonable doubt that if Gober had truthfully answered the questions propounded to him or if the State had made full disclosure of the facts, Gober's credibility would not have been further impaired in the minds of the jurors. That conclusion the majority reach by the strange process of reasoning that Gober had already been shown to be unworthy of belief.[2]

The conclusive answer, I submit, is that the jury did believe Gober's testimony beyond any reasonable doubt as evidenced by their verdict.

Has then the requirement of *Chapman* been met? Is it clear beyond a reasonable doubt that the jury's verdict would

---

**2.** "We are convinced that no jury would disbelieve a witness who admitted to being a burglar, a thief and a murderer simply because he had also been charged with possessing narcotics." (Majority opinion, p. 38.)  "It would not have destroyed any inference raised by the state's evidence, for it would be ludicrous to suggest that a charge of possessing narcotics would impair the image of an admitted murderer, burglar and thief." (Majority opinion, p. 39.)

have been the same if the jury had known the facts and circumstances which so seriously affect Gober's credibility, viz: that the police were holding over Gober charges of narcotics' law violations, and that they had promised Gober whatever help they could give him with his case in return for his cooperation in obtaining evidence against narcotics' peddlers? To me that is not clear. Juries reason differently from judges, and, with deference to my brothers, the jury's reasoning is sometimes the better. Obviously the jury believed Gober despite his record as an admitted murderer, burglar and thief. The jury doubtless recognized the hard fact that witnesses of excellent repute can rarely be produced to prove narcotics' violations. If the jury had been furnished the evidence to which it was denied access, its reasoning as to the effect of that evidence may have differed from the reasoning of the present majority in this case. Perhaps the jury would have reasoned that while a person of good character would not furnish false testimony to better himself, an admitted murderer, burglar and thief might do so. That process of reasoning is not so contrary to common sense that we can say beyond a reasonable doubt that the jury would have been uninfluenced if Gober had answered truthfully or if the State had disclosed the facts known to its police officers.

My brother Wisdom's scholarly opinion for the Court in Jackson v. Wainwright, 5th Cir. 1968, 390 F.2d 288, traces the development of the prosecutor's constitutional duty to disclose evidence favorable to the defendant. I shall do no more than touch on the milestones. The first case clearly to enunciate such a doctrine was Mooney v. Holohan, 1935, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 where the state prosecutor's knowing use of perjured testimony to procure the defendant's conviction was held to be a denial of due process of law. With deference to the majority in the present case, I submit that a careful reading of their opinion will disclose that they have stopped at this milestone and are not keeping pace with the developments of the doctrine in the more than thirty years since that case was decided.

Mooney v. Holohan was followed some seven years later in Pyle v. State of Kansas, 1942, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214, but the next milestone decision was Napue v. State of Illinois, 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217. That case marks at least two important advances: first, the Court substitutes the term "false evidence" for "perjured testimony," and, second, the Court places evidence affecting the credibility of a witness on a parity with evidence as to the commission of the crime. Speaking for a unanimous Court, Chief Justice Warren stated the doctrine as follows:

"* * * it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment * * *. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. * * *

"The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." (360 U.S. at 269, 79 S.Ct. at 1177)[3]

---

3. To like effect, see Ingram v. Peyton, 4th Cir. 1966, 367 F.2d 933; United States v. Poole, 7th Cir. 1967, 379 F.2d 645; Levin v. Katzenbach, 1966, 124 U.S.App. D.C. 158, 363 F.2d 287.

The next important development came in Brady v. Maryland, 1963, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 where the Court's holding was thus stated:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

As so well said by Judge Wisdom in Jackson v. Wainwright, supra, 390 F.2d at 295:

"In Brady v. Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the Court made it clear that its primary interest was not to punish misconduct by the prosecutor, but to insure a fair trial to the defendant, and particularly to insure that the trial would bring out, not hide, the truth."

The doctrine has been further developed in Miller v. Pate, 1967, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 and in Giles v. State of Maryland, 1967, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737.

In the light of the law as now developed, I submit, with deference, that the majority's labored consideration of whether the exact wording of the questions and of Gober's answers were such that Gober committed the state crime of perjury is not at all decisive. The majority takes pains to explain when the term of court ended and whether Gober committed perjury when he testified: "I don't have any pending cases against me." That statement was made in answer to the question: "Q. How many cases have they filed on you—do they

4. No question of admissibility was raised by any objection to this question or to the answer. The answer was clearly admissible for the purpose of showing the existence or lack of bias, prejudice or motive of the witness. See Hall v. State,

have over you right now?"[4]  In that context, it is immaterial, insofar as Luna is concerned, whether the cases were technically "pending," when it is without dispute that Gober was still subject to prosecution. The matters seriously affecting Gober's credibility were the cases which the police "have over you right now," and the promise of the police officers to give Gober "whatever help they could with his case" in return for his cooperation in obtaining evidence against narcotic peddlers. These matters, though fully known to the police, were never revealed to Luna.

With deference, I submit that the present majority has based its opinion and decision largely on the technicalities of the state law of evidence, and the strict requirements necessary to convict Gober of perjury. In the present state of the law, such technicalities and requirements peculiar to the laws of any one state have little or nothing to do with the application of the federal constitutional doctrine which prohibits the knowing use of false testimony and requires fair disclosure of facts and circumstances within the peculiar knowledge of the state which may be favorable to the defendant.

For the foregoing reasons, in addition to those stated in the majority opinion on original hearing and in Judge Wisdom's opinion for this Court in Jackson v. Wainwright, supra, I respectfully dissent.

TUTTLE, Circuit Judge (dissenting):

I think the original opinion of this court was right. I agree with the dissenting opinion written by Judge Rives and thus, I note my dissent from the opinion of the Court.

Tex.Crim.App.1966, 402 S.W.2d 752, 755, 756; O'Neal v. State, Tex.Crim.App.1912, 146 S.W. 938, 940, 941; Eaves v. State, 115 Tex.Cr.R. 460, 1930, 29 S.W.2d 339, 341; Wigmore on Evidence, § 949, p. 503, §§ 967, 968, pp. 525–527.